## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket Nos. 69-6-17 Vtec<br>& 167-12-17 Vtec |

| | |
|---|---|
| **Town of Westford v. Theodore Pelkey and Michelle Pelkey**<br><br>**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***<br><br>**In re Pelkey Zoning Permit Application** | **DECISION ON THE MERITS** |

### Decision on the Merits

Theodore and Michelle Pelkey (hereinafter referred to as "the Pelkeys") own and occupy a 11.32± acre parcel of land along Vermont Route 128 in Westford, Vermont ("the Property"). The Property is currently improved with a single-family residence, an attached garage, another garage that is not attached to their residence, and a separate, unattached accessory structure. When the Town of Westford Development Review Board ("DRB") denied Appellants' most recent application for authority to construct and use a new 8,000-square-foot garage structure, the Pelkeys filed a timely appeal with this Court. The Court assigned Docket No. 167-12-17 Vtec to that appeal. We coordinated the appeal with a zoning enforcement action, assigned Docket No. 69-6-17 Vtec, which the Town of Westford ("Town") brings against the Pelkeys, alleging that the Pelkeys deposited over 50 cubic yards of material and graded the Property without a permit.

In their efforts to further develop the Property, the Pelkeys have become embroiled in multi-layered and multi-year disputes with officials from the Town. We detail those disputes below, to the extent that they have resulted in litigation before this Division of our Superior Courts and are relevant to the proceedings now before this Court.

### Procedural History

The Pelkeys have been involved in several land use disputes concerning the Route 128 Property. See In re Pelkey Final Plat Major Subdivision, Nos. 172-12-12 Vtec, 30-3-12 Vtec (Vt.

Super. Ct. Envtl. Div. Dec. 31, 2014) (Durkin, J.); Pelkey Subdivision Amendment, No. 119-9-6 Vtec (Vt. Super. Ct. Envtl. Div. June 21, 2017) (Durkin, J.).

Both the DRB and this Court have previously reviewed several municipal land use applications concerning the Pelkeys' Route 128 Property. For this Court, those reviews began in 2012, when the Pelkeys filed applications for preliminary and final plat approvals for their prior development proposals. The Pelkeys had hoped to subdivide their property into two lots, with the rear lot hosting the existing buildings on their property (identified as Lot 2) and the front lot to host a new 4,000-square-foot building (identified as Lot 1). To accomplish this development plan, the Pelkeys submitted subdivision, conditional use, site plan review, and planned unit development ("PUD") applications. Those applications resulted in approvals issued by this Court, with conditions. See Pelkey Final Plat, Nos. 172-12-12 Vtec, 30-3-12 Vtec (Dec. 31, 2014).[1] However, at the time of our most recent trial, we were advised that the Pelkeys had decided not to proceed with that subdivision and development.[2]

More recently, the Court considered another appeal brought by the Pelkeys from a DRB denial of their application to amend the two-lot subdivision that this Court approved on December 14, 2014. As the Pelkeys and the Town were preparing for trial, the parties reached an agreement that resolved all of their disputes in that appeal. Their agreement was memorialized in a Corrected Stipulated V.R.C.P. 58 Judgment Order. See Pelkey Subdivision Amendment, No. 119-9-16 Vtec (June 21, 2017).[3]

---

[1] Docket No. 30-3-12 Vtec concerned the Pelkeys' application for preliminary subdivision plat approval. Docket No. 172-12-12 Vtec concerned the Pelkeys' application for final plat approval.

[2] The Pelkeys represented that they were unable to proceed with those subdivision and development plans because the DRB Chair refused to sign a mylar copy of the approved subdivision plat in a timely manner.

[3] The original Stipulated Judgment Order was issued on January 18, 2017. The Pelkeys thereafter filed a motion for relief from the original Judgment Order, due to the need for a specific reference in the Judgment Order to a site plat prepared by a licensed land surveyor. For this reason, the Court granted the Pelkeys' motion and issued the Corrected Stipulated V.R.C.P. 58 Judgment Order on June 21, 2017.

This procedural history is more fully explained in an Entry Order the Court recently issued, denying the Pelkeys' additional motion for further relief. See In re Pelkey Subdivision Amendment, No. 119-9-16 Vtec (Vt. Super. Ct. Envtl. Div. June 28, 2019) (Durkin, J.) (noting that in support of the original Stipulated Judgment Order, "the parties had failed to provide the Court with a site plat that was prepared and certified by a licensed land surveyor. State law directs that only a certified site plat can be accepted for recording in a town's land records. Appellants proposed that this deficiency could be corrected by the Court issuing a Corrected Stipulated Judgment Order, with

In the present zoning enforcement complaint in Docket No. 69-6-17 Vtec, the Town alleges that the Pelkeys have "commenced development" without the proper permit by bringing gravel and fill onto their property in excess of 50 cubic yards per year, and leveling the gravel and fill in a building area and as part of a proposed access drive. The Town asserts that each of these actions constitutes land development that requires a zoning permit. The Pelkeys dispute that they have committed the complained-of violations. When the parties could not reconcile their differences, the Town served the Pelkeys with a notice of alleged zoning violation and instituted a municipal enforcement action.

The Pelkeys' appeal from the DRB's denial of their zoning permit application in Docket No. 167-12-17 Vtec concerns the Pelkeys' goal of constructing an additional garage, access drive, and parking area on the portion of the Property closest to Vermont Route 128. After the Town's Zoning Administrator and DRB denied their application, the Pelkeys filed a timely appeal with this Court.

Also in Docket No. 167-12-17 Vtec, the Pelkeys assert that the Corrected Stipulated V.R.C.P. 58 Judgment Order in Docket No. 119-9-16 Vtec required the Zoning Administrator to automatically grant their pending application for a zoning permit. We address these claims in detail in the Conclusions of Law section below.

The Pelkeys were assisted in these coordinated proceedings by their attorney, Brian P. Monaghan, Esq. The Town was assisted by its attorney, John H. Klesch, Esq. No other party appeared or participated in either of the coordinated proceedings.

Based upon the credible evidence presented at the trial on these coordinated Dockets, including that which was put into context by a site visit the Court conducted in connection with the 2012 appeal, the Court renders the following Findings of Fact, Conclusions of Law, and Order, together with a Judgment Order that accompanies this Decision.

---

a certified plat prepared by a licensed land surveyor attached as Exhibit B. The parties' original non-certified plat remained attached to the Corrected Order as Exhibit A.").

**Findings of Fact**

**I.      The Pelkey Property and Surrounding Neighborhood**

1.       The Pelkeys reside on an 11.32± acre parcel of land that they own at 2189 Vermont Route 128 in Westford, Vermont.  The Property is currently improved with a single-family residence, an attached garage, another garage that is not attached to their residence, and a separate, unattached accessory structure.

2.       In the vicinity of the Pelkey Property, Vermont Route 128 travels in a general north/south direction.

3.       The Pelkeys' home is set back about 350 feet from the easterly edge of Route 128.  Their driveway travels in a general east/west direction from Route 128 to the front of their attached garage.  The southerly side of the driveway is located about 25 feet from the Property's southerly boundary.

4.       The area in front of the Pelkey home, just east of Route 128, has been open land that was grassed and undeveloped.  It was this area that the Pelkeys proposed to subdivide into two lots in 2012, with the front lot along Route 128 consisting of 2± acres, identified as Lot 1, and upon which the Pelkeys once proposed to construct a 4,000-square-foot building that this Court approved in its 2014 Merits Decision, referenced above.

5.       The Property is located in the Rural 5 Zoning District ("R-5 District").  The density within this zoning district is principally limited to one dwelling unit per five acres according to Section 242.A of the Town of Westford Land Use and Development Regulations, amended February 18, 2016 ("2016 Regulations").

6.       Mr. Pelkey owns and operates several businesses, including an excavation/contracting business.  Mr. Pelkey sometimes stores some of his excavation equipment in the second, unattached garage and in the accessory structure on the Property, as part of their home occupation.  Mr. Pelkey also uses the second garage to store some of his personal equipment and "toys."

7.       This Court rendered detailed Findings of Fact in its Merits Decision on the Pelkeys' 2012 subdivision and development applications.  Certain Findings detailed the character of the Pelkeys' Property and their surrounding neighborhood.  Since we received no evidence that changes have

occurred to the Pelkeys' Property (other than those complained of in the Town's enforcement action) or the use of nearby properties, we rely upon and incorporate our prior Findings in considering the current proceedings. See Pelkey Final Plat, Nos. 172-12-12 Vtec, 30-3-12 Vtec at 3-4, 8, 9-11 (Dec. 31, 2014).

**II.      The Fill and Excavation Activities that Led to the Town's Enforcement Complaint**

8.      Mr. Pelkey enjoys using his excavation equipment at his home to move and reshape the gravel, fill, and soil on the Property. His grandson sometimes helps Mr. Pelkey work the soil with his equipment. To complete this work, Mr. Pelkey often brings fill and soil onto the Property.

9.      In particular, beginning on or before May 9, 2017, Mr. Pelkey began bringing large amounts of gravel, fill, and other earthen material onto the Property and depositing it to the north of the driveway and in the vicinity of the designated building area for the former Lot 1.

10.      On or about May 22, 2017, Mr. Pelkey brought additional large quantities of gravel and fill onto the Property and also caused excavation equipment to be brought in. He began using the equipment, with the help of others, to spread and move the fill, gravel, and other earthen material on and around the area once described as Lot 1. The fill and excavation work largely occurred in a portion of the former Lot 1 but was not limited to that area.

11.      These fill and excavation activities appeared designed to prepare the site for development of a proposed building on the front portion of the Property, at a time when the Pelkeys did not have a permit or authority to conduct further development on the Property.

12.      More specifically, the fill and gravel had been spread in a manner to level off a possible building site and to prepare an additional driveway or access way to the potential building site from the existing home driveway. There was also work done to expand the existing home driveway. Mr. Pelkey confirmed that he did this work so that the driveway would be sufficient to turn around trucks and trailers he would bring onto the Property.

13.      Photos depicting the piles of gravel and fill deposited on the Property were admitted at trial as Town Exhibit K. They accurately depict the fill that Mr. Pelkey had brought onto his Property and later spread and graded on his Property during various times in May 2017.

14.      Town officials received one or more complaints concerning what was perceived to be unlawful earthen deposits, excavation work, and development on the Property.

15.     Zoning Administrator Kate Lalley investigated those complaints.  Ms. Lalley took the photos admitted as Exhibit K.  In her first visit to the Property, Administrator Lalley viewed a pile of fill and gravel that she determined <u>was not</u> in excess of 50 cubic yards.  However, on her return to the Property on about May 23, 2017, Ms. Lalley observed that additional fill and gravel had been deposited on the Property.  Due to her prior experience as a zoning administrator and landscape architect, Administrator Lalley credibly determined that the total amount of fill deposited on the Property during the month of May 2017 was in excess of 50 yards.

16.     In response to Interrogatories that were admitted at trial as Town Exhibit F, Mr. Pelkey admitted that between March 29, 2017, and May 23, 2017, he brought more than 50 cubic yards of fill or other earthen materials to the Property.

17.     Mr. Pelkey disputed the Administrator's estimate of the amount of fill and gravel he had brought on the Property in May 2017, but he could not, or would not, provide his own estimate of the amount of fill and gravel brought in.  The Court determined that Ms. Lalley's testimony and estimate was more credible than that of Mr. Pelkey, and therefore finds that the amount of fill and gravel brought onto the Property in May 2017 was in excess of 50 cubic yards.

18.     Administrator Lalley then sent a letter to Mr. and Mrs. Pelkey entitled "**NOTICE OF ZONING VIOLATION**" detailing what she had observed or was otherwise brought to her attention concerning the bringing of gravel and fill onto the Property in excess of 50 cubic yards, and spreading the fill and gravel in "a large rectangular area" so as to level off and cover that rectangular area, all of which constituted "land development," prior to obtaining a permit, as required by the 2016 Regulations.  A copy of Administrator Lalley's letter, dated May 23, 2017, was admitted at trial as Town Exhibit I.  That letter is hereinafter referred to as "the NOV."

19.     In the NOV, Administrator Lalley specifically identified the activities that she determined were zoning violations and directed the Pelkeys to immediately cease their land development activities.  The NOV also informed the Pelkeys that they "ha[d] seven (7) days from the date of this notice to discontinue these violations and take appropriate remedial action," including returning the site to the condition it was in before the development work began.

20.     Administrator Lalley concluded her NOV by notifying the Pelkeys that if they "failed to accomplish the actions directed . . . within seven (7) days . . ., then beginning on the eighth (8)

day . . . [they] may be subject to a fine of up to $200.00 per day for each day that each violation continues" and that the Town may commence an enforcement action against them.

21.     Finally, the NOV provided notice of the Pelkeys' right to appeal to the DRB, as long as their appeal was filed within 15 days.

22.     There was no evidence presented of the Pelkeys bringing additional gravel or fill onto their Property after the NOV, or of continuing to use excavators to move fill and gravel on their Property.  However, the Pelkeys chose not to remove the unpermitted fill and gravel from the Property.  They also chose not to return the Property to its original condition, as directed by the NOV.

23.     On or about May 30, 2017, Mr. Pelkey contacted the Zoning Administrator to advise her that he was going forward with the development of his new building site, and that he had scheduled a concrete contractor to pour a slab for his new building in the area of the former Lot 1.  The Zoning Administrator advised Mr. Pelkey that his planned further development of the site would be a further violation of the Regulations and would "only make matters worse" for him.  Mr. Pelkey became angry and replied to the Administrator: "I'll see you in Court."

24.     The Pelkeys chose not to appeal the NOV and allowed the time in which they could appeal the NOV to pass.  The Town filed a zoning enforcement complaint with the Court on June 1, 2017, based upon the unappealed NOV.

25.     The Town was concerned that the Pelkeys would proceed with the pouring of concrete for their proposed building prior to receiving a zoning permit that authorized that development.  So, with its complaint, the Town also filed motions for a preliminary injunction and a temporary restraining order.  Those motions became moot when the Pelkeys volunteered to cease work on the Property.

### III.     The Pelkey Zoning Permit Application

26.     Sometime in April or May 2017, the Town gave notice that an amendment had been adopted to its Land Use and Development Regulations, and that the amendment would go into effect on July 27, 2017.  Those amended Regulations are hereinafter referred to as the "2017 Regulations."

27.     On July 10, 2017, the Pelkeys' engineer, Jeffrey Kershner, submitted a zoning permit application on the Pelkeys' behalf. Copies of that application and attachments were admitted at trial as Pelkey Exhibit 2 and Town Exhibit J. The application form describes the proposed new building as an 8,000-square-foot garage structure. An unsigned site map attached to the application depicts a garage building and a large "Proposed Gravel Drive." This site map does not give the dimensions of the garage or the driveway, nor does it depict parking spaces.

28.     At trial, Mr. Kershner presented a revised site plan embossed with his engineer's seal as an act of certification, which provides more detail than the site map attached to the application. A copy of Engineer Kershner's site plan was admitted at trial as Pelkey Exhibit 4. It details the dimensions of the proposed garage as 80' by 100' (totaling 8,000 square feet), includes topographical information, and depicts the existing Pelkey home, attached garage, unattached garage, and accessory structure. Engineer Kershner's site plan does not include the dimensions of the proposed drive to the building and does not delineate parking spaces.

29.     While the site plan does not include the driveway dimensions, the credible evidence at trial revealed that the driveway would encompass a total area of 13,000+ square feet.

30.     By comparison, the Pelkey home is much smaller than the proposed garage. The home measures 28' by 52' and therefore encompasses a 1,456- square-footprint and 2,360 square feet of interior space, including the attached garage  The home is a Cape-style home (without second floor dormers), whereas the proposed new garage may be approximately 35 feet in height at its peak.

31.     Pelkey Exhibits 7-1 through 7-8 provide demonstrations of what the proposed additional accessory structure may look like, once construction is completed. Screening is to be provided by landscape plantings, as depicted in Exhibits 7-5 through 7-8, but the actual plantings will not reach the height and fullness of the trees depicted in the Exhibits for as many as ten years or more.

32.     Exhibits 7-9 through 7-15 depict nearby properties that have both residences and unattached garages or accessory structures. We note that, with one exception, none of the nearby accessory structures are as large as the 8,000-square-foot structure that the Pelkeys

propose and that none of the accessory structures, again with one exception, are located so prominently in the front area of the respective property.

33. The proposed garage accessory structure, due to its height, size, and location on the lot, features much more prominently on the Property than the Pelkey residence. Due to the current design and location of the proposed structure, the Pelkey residence will actually appear to be subordinate and incidental to the proposed garage structure.

34. Given the presence of the unattached garage and accessory hoop house that already exist on the Property, it will be difficult, if not impossible, for the average observer to identify the proposed garage structure as an incidental and subordinate accessory structure to the residence.

35. The Pelkeys plan to install exterior lighting for the proposed structure that will be similar in scope to exterior lighting on an average home. The lighting that they propose was not otherwise detailed.

36. Up to ten vehicles will be parked in undefined locations on the proposed gravel drive.

37. There will be no outdoor storage except a small trash dumpster on the east side of the proposed garage, facing the residence.

38. The Pelkeys pledge to install a silt fence and other erosion control measures that comply with the Town of Westford Stormwater Management Low Impact Development practices and the Low Risk Handbook.

39. When the Pelkeys' application was submitted to the Zoning Administrator, it was substantially identical to the application presented at trial, albeit with some more detailed supporting documents, such as the engineer-certified site plan and the depictions of the proposed structure and landscaping.

40. Mr. Pelkey initially refused to disclose the use to which he intended to put this new garage. Engineer Kershner referenced Mr. Pelkey's mono-filament and tanker inspection businesses that he currently operates in a rented commercial building in nearby Swanton, Vermont, and that it was Mr. Pelkey's desire to some day move these businesses to the Property, so that he would no longer have to pay rent and so that his businesses would be adjacent to his home.

41.     Engineer Kershner advised that seeking a zoning permit for the proposed garage was a "baby step" towards Mr. Pelkey's long-range plans for the Property.

42.     Mr. Pelkey later asserted that he now regards the proposed garage as an "accessory structure" to his home, in addition to the accessory structure and garages he already has on his Property.

43.     Mr. Pelkey at times stated that he would use this new accessory garage structure in connection with his existing home occupation.  However, his pending application makes no reference to and does not seek approval for a home occupation use.

44.     Mr. Pelkey already is permitted for a separate home occupation use, which is housed in the existing accessory structure.

45.     Alternatively, Mr. Pelkey suggested that he intends to use this new accessory garage structure to store personal items and equipment from his home occupation, including equipment that he currently stores in the existing accessory structure, which is sometimes referred to as a "temporary hoop house."

46.     Mr. Pelkey first installed the temporary hoop house on the Property sometime in 2009; he did so without first securing a zoning permit.  When his hoop house installation was brought to the prior zoning administrator's attention, she issued a notice of alleged zoning violation on November 12, 2009.  A copy of that notice was admitted at trial as Town Exhibit S.

47.     Mr. Pelkey chose not to file a timely appeal from the November 2009 notice of violation.

48.     He later submitted an application for the hoop house to be used as an accessory structure for his home occupation.  That application was approved on May 3, 2010, by the then-zoning administrator.  A copy of that permit approval was admitted at trial as Town Exhibit C.  At some point this hoop house was referred to as "temporary," but it has remained in place for nine years. The Town approval does not require it to be taken down.

49.     While the current application does not specify the 8,000-square-foot garage's intended use, Mr. Pelkey advised the Zoning Administrator that he intended to use it to host a home occupation.  He did not provide any details as to what type of home occupation would occupy the new garage structure.

50.    The Administrator reviewed the application for conformance with the Regulations and advised Mr. Pelkey that she could not approve the application as presented. She provided the Pelkeys with a written explanation for the six reasons why she could not approve the application. Those six reasons are detailed in a note attached to her application denial form. See Town Exhibit G at 2.

51.    In summary, the Zoning Administrator listed the following reasons for her denial of the Pelkey zoning permit application:

1.  The 2017 Regulations[4] require any type of home occupation to be operated in either a portion of a residence or an accessory structure.[5]

2.  The proposed garage structure is not "incidental and subordinate in size and overall appearance to the" Pelkeys' residence, as required to be accessory pursuant to the 2017 Regulations.[6]

3.  The application does not comply with 2017 Regulations §§ 301 and 330 because it (1) fails "to describe the actual use . . . [of the] home occupation, . . . [or] that the occupation is customary in residential areas, will not change the character of the area and complies with the applicable standards"; and (2) fails to "demonstrate that the proposed home occupation will operate within the limits of the Performance Standards . . . ."

4.  The site plan does not comply "with any of the Site Design & Engineering Standards in Chapter 320 of the Regulations, as required by Section 421.A(1) of the Regulations."

5.  "Applicants have neither submitted copies of any . . . [state required] permits or approvals, nor demonstrated that the State does not require any other permits or approvals" which was requested and required by the Zoning Administrator.

6.  Applicants "fail to demonstrate that the proposed garage building and home occupation meet the Planning and Design standards for development in the Rural 5 District."

---

[4]  The parties dispute whether the 2016 Regulations or the 2017 Regulations apply to the Town's enforcement action or the Pelkeys' permit application. We address this dispute in our Conclusions of Law section, below.

[5]  While not explicitly stated, the Administrator's language seems to question the propriety of there being more than one accessory home occupation structure on one property.

[6]  Both versions of the Regulations include identical definitions for "Structure, Accessory" and for the regulation of home occupations. See § 510(18) and § 301 et al., respectively.

52.     When the Zoning Administrator called Mr. Pelkey to advise him that she felt that she was unable to grant his permit application, he advised her that he planned to nonetheless go ahead with the construction of the 8,000-square-foot structure immediately and without a permit.

**53.**     The Pelkeys thereafter appealed the Zoning Administrator's denial of their application to the DRB.  When the DRB also denied their application, the Pelkeys appealed to this Court.

**IV.     The Town's Claims for Injunctive Relief and Fines**

54.     In response to the Pelkeys' zoning violations, as detailed in the NOV, the Town requested assistance from its lawyers to prepare an enforcement complaint, to strategize how best to convince the Pelkeys to comply with the NOV and Regulations, and to prosecute the Pelkeys, should they choose not to comply.

55.     The Town attorneys detailed the time and expenses incurred in their efforts to respond to the Pelkeys' zoning violations.  The attorneys were careful to maintain records for their time and expenses incurred for the zoning violations separate from any time and expense they were asked to incur in response to the Pelkeys' various permit application appeals, such as those in Docket Nos. 119-9-16 Vtec and 167-12-17 Vtec.

56.     Copies of the attorneys' detailed billing statements, with confidential information redacted, were admitted at trial as Town Exhibit H.  A summary of those billing statements was admitted at trial as Exhibit Y.

57.     The Selectboard Chair credibly testified that the Selectboard reviewed their attorneys' billing statements concerning the enforcement actions against the Pelkeys, found those billing statements to be reasonable, and authorized their payment.  No credible evidence was presented to contradict the Selectboard Chair's testimony on these points.  The total of these attorney billings is $10,294.98 through the billing period ending in February 2018.  The Court concludes that these attorneys' fees were reasonable for the services performed, and that there were further fees not detailed that were incurred and paid to respond to the Pelkeys' pre-trial filings, and to prepare for and prosecute the trial.

58.     As of the last day of trial testimony, the Pelkeys had still not removed the fill and gravel in excess of 50 cubic yards that they caused to be deposited and excavated on their Property in the period lasting from March to May 2017.  They have failed and refused to return the Property

to the condition it existed in before they conducted the unpermitted work in May 2017, and they have failed to apply for or receive any permits that authorized the fill deposits or excavation work.

59.     The Pelkeys' non-compliance with the NOV began on May 31, 2017, which marked the eighth day after the NOV was issued.  Given that the Pelkeys' non-compliance continued through the last day of trial (January 30, 2019), their zoning violations have continued for a total of 610 days.[7]

## Conclusions of Law

We first address the legal claims presented by the Town in its zoning enforcement complaint.  We follow that analysis with a review of the Pelkeys' claims in support of their zoning permit application.  Finally, because we determine that the Pelkeys have committed the zoning violations claimed by the Town, and conclude that the Pelkeys have failed to present sufficient evidence to show that their zoning permit application complies with all the applicable provisions of the Regulations, we also conclude that the Town is entitled to injunctive relief and fines.

But even before that, we address the parties' dispute as to which version of the Regulations governs the Town's zoning enforcement claims and which govern the Pelkeys' permit application.  When the Town filed its enforcement complaint on June 1, 2017, the Regulations then in effect were those that were last amended on February 18, 2016 (which we have referred to as the 2016 Regulations).  A copy of the 2016 Regulations was admitted at trial as Pelkey Exhibit 15.  We therefore conclude that the 2016 Regulations were those that were in effect at the time that the Town filed its enforcement complaint and that the 2016 Regulations therefore govern the Town's enforcement complaint.  We note that the difference between the 2016 and 2017 Regulations appears to be inconsequential with respect to the enforcement action, as the applicable provisions are identical.

---

[7]  However, we again note that we received no evidence that the Pelkeys continued to bring additional fill and gravel onto their property after issuance of the NOV.

-13-

Sometime in May or June 2017, the Town gave notice that the Regulations had been further amended.[8] The amended version went into effect on July 27, 2017. A copy of the 2017 Regulations was admitted at trial as Pelkey Exhibit 12 and Town Exhibit D.

We follow a general rule that the governing zoning regulations are those that were in effect when a complete application was filed. In re Times & Seasons, LLC, 2011 VT 76, ¶ 12, 190 Vt. 163 (citations omitted). However, when a Vermont municipality amends its zoning regulations, our Legislature has enacted an exception to the general rule. When an ordinance amendment is adopted and goes into effect within 150 days of the notice of its "first public hearing . . . [concerning the proposed zoning amendments], the administrative officer . . . shall review any new application filed after the date of the notice [of first public hearing] under the proposed bylaw or amendment and applicable existing bylaws and ordinances." 24 V.S.A. § 4449(d) (emphasis added); see, e.g., In re Cushing Family, LLC Site Plan Application, No. 61-4-09 Vtec, slip op. at 6-7 (Vt. Envtl. Ct. Dec. 17, 2009) (Wright, J.). This provision contains two caveats that are not relevant here.

With this statutory mandate in mind, and given that the 2017 Regulations went into effect on July 27, 2017, and that the proposed amendment was noticed before the Pelkeys' application, we conclude that the Pelkeys' application for a zoning permit is governed by the 2017 Regulations.

The parties' dispute concerning the governing Regulations initially appeared confusing, since most or all of the substantive provisions that governed the parties' claims appeared identical in the 2016 and 2017 Regulations. Compare Chapters 240 (R-5 District), 300 (Home Occupations), 420 (Site Plan Review) and 510 (Definitions) in the 2016 and 2017 Regulations. However, one distinction became clearer upon review of the parties' post-trial briefs: the 2017 Regulations contain a directive that the Zoning Administrator "must not issue a zoning permit for any land use or development" prior to the DRB granting site plan approval, ". . . except for (1) [c]onstruction of . . . any development ancillary to a single-family . . . dwelling, including, but

---

[8] The Town represented that the amendment that distinguishes the 2017 Regulations was noticed "about 100 days" before the July 27, 2017 effective date. Since no testimony or other evidence was offered to contradict this representation, we have adopted it in our Factual Finding ¶ 26.

not limited to an accessory dwelling or home occupation that does not include a structure of more than 1,000 square feet." 2017 Regulations § 421.A. The 2016 Regulations include a nearly identical exception that does not limit the exception to an accessory dwelling or home occupation of less than 1,000 square feet. See 2016 Regulations § 421.A. The consequence of this difference is that, under the 2017 Regulations, the Pelkeys' application involving an 8,000-square-foot structure requires site plan approval from the DRB before the Zoning Administrator can issue a permit. The 2016 Regulations would exempt the structure from site plan review, regardless of its size.

The Pelkeys assert that the 2016 Regulations govern all legal issues presented. The Town appears to agree that its enforcement complaint is governed by the 2016 Regulations. However, for the reasons stated above, we conclude that under 24 V.S.A. § 4449(d), the 2017 Regulations govern the Pelkey application now before this Court.

Having so concluded, we now discuss the merits of the Town's enforcement action, the Pelkeys' permit application, and the Town's request for relief.

## I.    The Town's Enforcement Action

The 2016 Regulations specifically direct that "[a]ll development and subdivision of land must conform to these regulations" and that any development "requires a zoning permit issued by the Administrative Officer unless it is specifically exempted in Chapter 110."[9] 2016 Regulations §§ 103.A, 103.B. Some of the specific types of development requiring a permit include "[m]ining, excavating, filling, or grading land." 2016 Regulations § 103.A(2).

We are further guided in our analysis by an exemption to the permit requirement, which excludes the following:

> Minor grading, filling, excavating, clearing, or similar types of land disturbance . . . that is incidental to a lawful use and that does not involve adding, removing, or moving more than 50 cubic yards of material to, from, or within a lot in any calendar year."

2016 Regulations § 111.A(14).

---

[9] The exemptions listed in the 2016 Regulations are not applicable to the violations alleged by the Town or to the development and use proposed by the Pelkeys in their permit application.

Because Mr. Pelkey admitted in his responses to the Town's Interrogatories (admitted as Town Exhibit F) that he had moved more than 50 cubic yards of fill and gravel onto and around his Property between March and May 2017, we conclude that this exemption does not apply and the Pelkeys were required to obtain a zoning permit for their 2017 fill and gravel work. Further, we found the testimony of the Zoning Administrator most credible and persuasive. Administrator Lalley stated that by her estimate, which was informed by her observations and experience as a zoning administrator and landscape architect, the material exceeded 50 cubic yards.

We also note that this exemption only applies to work encompassing less than 50 cubic yards that is "incidental to a lawful use." Id. The credible evidence convinces this Court that Mr. Pelkey was moving and grading the gravel and fill he brought onto his Property to begin the initial development of the site to host his 8,000-square-foot garage, a structure for which he had not yet secured a zoning permit. Thus, any of his fill and gravel work cannot be regarded as "incidental to a lawful use." For this additional reason, we conclude that the Pelkeys were in violation of the requirements of the 2016 Regulations.

A further procedural fact confirms our legal conclusions: the Pelkeys failed to file a timely appeal from the NOV served upon them by the Zoning Administrator. By failing to timely challenge the NOV in an appeal, the Pelkeys gave up their right to contest the allegations contained in the NOV. See 24 V.S.A. § 4472(d) (directing that when an interested person fails to file a timely appeal, that person "shall be bound by that decision or act"); see also In re Newton Enterprises, 167 Vt. 459, 463 (1998).

For all these reasons, we conclude that Mr. and Mrs. Pelkey allowed the noticed zoning violations to occur on their Property, including (a) commencing land development without a required zoning permit; (b) commencing land development outside of the approved building envelope; (c) changing or adding a use on their Property without prior approval pursuant to § 243 of the 2016 Regulations (defining the allowed use standards for the R-5 District); and (d) made changes to the site on their Property without prior approval under Chapters 240 and 320 of the 2016 Regulations.

We detail what consequences will arise as a result of the zoning violations that the Pelkeys committed in Section III, below. Prior to detailing those consequences, we believe it appropriate to evaluate the Pelkeys' zoning permit application.

**II.     The Pelkeys' Zoning Permit Application**

The Pelkeys originally presented thirty Questions in their Statement of Questions, filed on January 16, 2018. Then, at the beginning of our first day of trial, on January 29, 2019, the Pelkeys withdrew fourteen Questions, thereby leaving Questions 1–6, 8, 10, 12–14, 16–17, and 21–23 for the Court to adjudicate. Most of the Pelkeys' remaining Questions are presented as challenges to the propriety of the DRB's actions in the permit application proceedings below. Only Question 6 and Question 8, though general in nature, present issues that this Court can assess in its de novo review of the Pelkeys' permit application. See In re Appeal of Yates, No. 158-9-04 Vtec, slip op. at 8-9, 11-12 (Vt. Envtl. Ct. Apr. 17, 2017) (Durkin, J.) (describing this Court's de novo standard); 10 V.S.A. § 8504(h) (providing for de novo review); V.R.E.C.P. 5(g) (same).

**A.  Whether the Project Required DRB Approval (Question 6)**

The Pelkeys present several arguments to support their claim that the Zoning Administrator should have approved their permit application automatically and did not need to refer the application to the DRB, and that this Court should automatically approve that application now. The answer to this Question determines the standards this Court must apply to the application in this review. Due to the relevance of the history of the parties' disputes and litigation, we first look to the last appeal by the Pelkeys that was adjudicated by this Court.

In that prior appeal, the Pelkeys and the Town came to an agreement that allowed this Court to grant the Pelkeys' application to modify their previously approved building envelope in their subdivided Lot 1. See Pelkey Subdivision Amendment, No. 119-9-16 Vtec (June 21, 2017). The parties' settlement also anticipated that the Pelkeys would file a further application for authority to develop the building area on Lot 1, although the Pelkeys had not yet submitted that application and had not yet disclosed their specific development plans. Id.

The Town has a somewhat unique mechanism to assess whether to approve a proposed development; that mechanism incorporates a point system to assess whether the proposed development meets or exceeds certain conditional use review criteria. See 2017 Regulations

§ 244.C(4). Those provisions require that a proposed development "must attain a final score of 27 or more points (out of a possible 40) to be approved by the Development Review Board." 2017 Regulations § 244.C(3).

We cite to these provisions to provide a better understanding of the parties' settlement in the prior appeal (Docket No. 119-9-16 Vtec). As part of their settlement, the parties incorporated some of their settlement terms into a Corrected Stipulated V.R.C.P. 58 Judgment Order, which this Court signed and filed on June 21, 2017.

As part of those settlement terms, the parties agreed, and the Court adopted, that "[a]ny future application, revised as follows, achieves a [minimum] score of 23 points under Section 244 . . . ." Pelkey Subdivision Amendment, No. 119-9-16 Vtec at 1 (June 21, 2017). Crucial to the present appeal, under ¶ 5 of the Corrected Stipulated Judgment Order, the 23-point system is not binding on either party for any Pelkey application that requires approval from the DRB and not just the Zoning Administrator.

The listed revisions address site conditions and improvements; they do not specify any details as to the development that might be proposed. Id. We understand that the parties intended to set a base line for the point assessment if the Pelkeys meet those general conditions. To secure a zoning permit from the Zoning Administrator pursuant to the Order, when additional DRB review is not required, the Pelkeys are required to submit an application that conforms to the 23 directive in the Corrected Stipulated Judgment Order, and then further present evidence to convince the Administrator that their new application also complies "with the Westford Land Use and Development Regulations in effect at the time the [Pelkeys] submit a complete application." Id. at 1.

Given our analysis above concerning the directive of 24 V.S.A. § 4449(d), we must conclude that the 2017 Regulations were in effect when the Pelkeys filed their complete application on July 1, 2017.

As we noted above in our discussion of the one substantive distinction between the 2016 and 2017 Regulations, a Zoning Administrator is directed by both versions of the Regulations to "not issue a zoning permit for any land use or development" without site plan review from the DRB, but certain exceptions apply. Regulations § 421.A (emphasis added). In the 2016

-18-

Regulations, one exception to the prohibition against the Administrator issuing a zoning permit is for "[c]onstruction of a single-family . . . dwelling, or any development ancillary to a single-family . . . dwelling, including, but not limited to a home occupation or accessory dwelling." 2016 Regulations § 421.A(1). The 2017 Regulations contain an identical exception but limit the exception to "an accessory dwelling or home occupation <u>that does not involve a structure of more than 1,000 square feet</u>." 2017 Regulations § 421.A(1) (emphasis added). In sum, under the 2017 Regulations, structures of more than 1,000 square feet that are proposed as part of a home occupation do not get the benefit of the § 421.A(1) exception and must undergo DRB review.

Because we have concluded that the 2017 Regulations govern the pending application, we apply the size limitation on the § 421.A(1) exception. We therefore conclude that the Zoning Administrator alone <u>could</u> <u>not</u> grant a zoning permit for the Pelkeys' proposed garage, since it involves an 8,000-square-foot structure. The Pelkey application needed to be considered by the DRB pursuant to ¶ 5 of the Corrected Stipulated Judgment Order and § 421.A. As discussed further below, this is determinative of the standards we apply in our appellate review.

**B. Whether the Project satisfies the 23-Point Criteria of the Corrected Order (Question 8)**

The next Question that the Pelkeys pose in their Statement of Questions that is subject to our review is their Question 8: does the proposed garage, access drive, and parking "satisfy the 23-point criteria in ¶ 3 of the Corrected Stipulated Judgment Order[?]"

Our prior analysis allows us to succinctly answer this Question. By its terms, ¶ 3 of the Corrected Stipulated Judgment Order is only applicable when the application "does not require approval by the Westford Development Review Board . . . ." Since the 2017 Regulations prohibit the Zoning Administrator from issuing a zoning permit when "an accessory dwelling or home occupation . . . involve[s] a structure of more than 1,000 square feet," the provision in the Corrected Stipulated Judgment Order that incorporates the 23-point system is not applicable to the review of the application that the Pelkeys submitted. Since the Zoning Administrator is barred from independently issuing a zoning permit for a garage of the size the Pelkeys proposed, their only recourse was to seek review by the DRB.

We therefore answer the Pelkeys' Question 8 in the negative, since we conclude that the application and site plan that they presented was not entitled to the 23-point assessment that

the parties established in the Corrected Stipulated Judgment Order from Docket No. 119-9-16 Vtec.

### C. Whether the Proposed Garage Qualifies as an Accessory Structure

Given the preceding conclusions, we must evaluate the Pelkeys' application under the 2017 Regulations without the benefit from the § 421.A(1) exception and the 23-point system of the Corrected Stipulated Judgment Order.

In our initial review of the Pelkeys' application and their legal arguments in support of it, we are troubled by the Pelkeys' admission that they did not specifically request approval in their application to operate a home occupation from the proposed 8,000-square-foot garage, and by their assurance that, even though their application does not request it, we can consider such a request in this appeal. An application sets the parameters of the jurisdiction enjoyed by a zoning administrator, which in turn defines the jurisdiction of the appropriate municipal panel and this Court on appeal. See In re JLD Props. – Wal-Mart St. Albans, Nos. 242-10-06 Vtec, 92-5-07 Vtec, & 116-6-08 Vtec, slip op. at 17-18 (Vt. Envtl. Ct. Mar. 16, 2009) (Durkin, J.); 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). However, having reviewed the Zoning Administrator's denial of the application (Town Exhibit G) and the DRB denial of the application, which is part of the record on appeal, we conclude that the Pelkeys must have orally requested that the Administrator consider a home occupation request, and that the Administrator in the first instance, and the DRB on appeal, considered a request for home occupation approval.

To receive home occupation approval, an applicant must show conformance to § 301 of the 2017 Regulations. One of the criteria incorporated into the home occupation analysis is conformance with the Performance Standards found in § 330. See 2017 Regulations §§ 301.B(4) and 301.C(4). As a threshold matter, the Pelkeys force us to conclude that they have failed to provide sufficient detail about their proposed garage or their intended use to allow us to conduct an analysis of their conformance to the Performance Standards.

The Pelkeys first argue that since they already operate a home occupation from their temporary hoop house accessory structure they should automatically be allowed to operate a home occupation from their new proposed 8,000-square-foot garage. We find no support in the 2017 Regulations or the enabling statutes to support this argument. First, since the Pelkeys offer

-20-

no assurance that they intend to discontinue the use of their existing accessory structure, measuring about 1,400 square feet, we can only conclude that the new garage would be used in addition to, and not instead of, their existing accessory structure. Second, the Pelkeys have been reluctant to detail what use, home occupation or otherwise, would be conducted in their new garage. Mr. Pelkey first declined to detail what the garage would be used for; at one point, his engineer explained that getting this garage permitted was "the first baby step" in getting approval to move his businesses from Swanton to his Property.

The Pelkeys have not provided details as to the nature of the new home occupation to be conducted in the new garage, or specific information on what equipment or other items would be stored in this new garage. Without this information, we cannot be assured that the construction and use of this new, 8,000-square-foot garage will "not regularly generate customer or truck traffic that would alter the character of the area or negatively impact the use of adjacent property." 2017 Regulations §§ 301.B(2) and 301.C(2). In short, the Pelkeys' vague and varying testimony left us wondering what the future use of this garage would actually be.

The Pelkeys have represented at various times that eight to ten vehicles may be parked on the access drive to the new garage, but they have not detailed why there would be up to ten vehicles at the garage. We therefore have no way of discerning the employees, visitors, or others who will be frequenting the garage, or what traffic impacts may be generated by the Pelkeys' use of this garage.

The Pelkeys' characterization of their proposed garage as an "accessory structure" presents further challenges for their application. The 2017 Regulations define an accessory structure as "a structure that is incidental and subordinate in size and overall appearance to the principal structure on the same lot." 2017 Regulations § 511.A(2). The parties agree that the principal structure on the Pelkeys' Property is their 2,360-square-foot home (including the attached garage). Based upon the evidence presented at trial and witness testimony, there is nothing about the proposed garage that is incidental and subordinate in size and overall appearance to the Pelkeys' residence. The residence is less than a third of the square footage of the proposed garage. Current views of the Pelkey home will be obscured or effectively blocked by the proposed garage, due to the garage's size and prominent location on the front portion of

the Property. In fact, we anticipate that, if the Court were to grant this application and the garage were to be built, many if not all new visitors to the Pelkey Property would assume that the garage was the primary structure on the Property, with a residence behind it as an incidental accessory structure.

We are further troubled that the Pelkeys and their engineer hedged their descriptions of the proposed garage, noting at trial that the design "has not yet been finalized." We were not presented with an exact peak height of the garage and were only offered demonstrative exhibits of what the garage "might look like." In short, we were not provided with the basic specificity necessary to render conclusions about whether the proposed garage would conform to § 301 of the 2017 Regulations. Based on what we have seen, however, we cannot conclude that the proposed garage would qualify as an accessory structure, as defined by § 511.A(2) of the 2017 Regulations.

For these reasons, we must **DENY** the Pelkeys' zoning permit application.

### III.   The Town's Claims for Injunctive Relief and Fines

We now come to the final analysis required in the pending proceedings. Given that we have concluded that the Pelkeys violated the 2016 Regulations, as described in the NOV, we must determine how to respond to the Town's request for injunctive relief and fines. See 24 V.S.A. § 4451(a) (providing for a maximum fine of $200.00 per day for each zoning offense); 24 V.S.A. § 4452 (providing for injunctive relief).

In assessing the Town's claims, we are guided by the Uniform Environmental Law Enforcement Act. 10 V.S.A. §§ 8001, et seq. While the Act is specifically applicable to enforcement actions brought by the Vermont Agency of Natural Resources and the Vermont Natural Resources Board, we have previously relied upon the Act when determining how to assess claims by Vermont municipalities that have brought enforcement actions under their zoning regulations. See, e.g., City of Burlington v. Muir, No. 117-8-13 Vtec, slip op. at 6-8 (Vt. Super. Ct. Envtl. Div. Jan. 23, 2015) (Walsh, J.).

We first note that we received no testimony or other evidence that the Pelkeys continued to bring additional fill and gravel onto their Property after being served with the NOV. However, because of Mr. Pelkey's comments to the Zoning Administrator regarding his intent to proceed

without a permit, we conclude that an injunction is warranted, especially since there was no evidence presented that the Pelkeys have returned the site to its original condition, as the Administrator directed in the NOV. We therefore include in our Order an injunction barring the Pelkeys from bringing further fill, gravel, or other earthen material onto their Property in excess of 50 cubic yards per year without first receiving a permit from the Town authorizing them to do so. We further direct that within 30 days of this Decision, the Pelkeys shall remove the gravel, fill, and other earthen material from their building site, and lay topsoil on the building site and access drive, along with seed and mulch.

As to the Town's claim for fines, we compare the circumstances presented by this matter to the subsections of 10 V.S.A. § 8010(b), part of the aforementioned Uniform Environmental Law Enforcement Act, for guidance and note the following:

(1) We did not receive evidence of an actual or potential impact on public health, safety, or welfare that has occurred as a result of the Pelkeys' zoning violations.

(2) We find that there was some evidence of mitigating circumstances, in that it appears that the Pelkeys ceased bringing substantial amounts of additional fill onto the Property after receiving the NOV. We are also disturbed by the animosity between the Pelkeys and the Town officials with whom they have interacted, but conclude that Mr. Pelkey has contributed to this animosity, and continues to do so by his sometimes-unfounded accusations against Town officials.

(3) The Pelkeys, particularly Mr. Pelkey, knew and had reason to know that their actions constituted zoning violations. The evidence further showed that Mr. Pelkey has at times exhibited a disregard for the Regulations and the obligation of any Town resident to abide by those Regulations. He built the temporary hoop house without first receiving a zoning permit and has been the subject of two previous notices of zoning violations. Mr. Pelkey also advised the Zoning Administrator that he planned to go forward with his current construction activities without a permit. This perhaps represents the most egregious aggravating factor when assessing the proper fines to impose on the Pelkeys.

(4) As noted above, either the Pelkeys or Mr. Pelkey alone have been the subject of two prior notices of alleged zoning violations. We also take into consideration here Mr. Pelkey's asserted intention of continuing to construct without complying with the applicable zoning regulations.

(5) [This subsection of 10 V.S.A § 8010(b) has been repealed and we therefore do not consider it.]

(6) We conclude that there is a likelihood that the Pelkeys may again fail to comply with the Regulations, unless the fine imposed is of a significant level to help deter future non-compliance.

-23-

(7) The Town has incurred attorneys' fees and expenses of $10,294.98, solely related to the Pelkeys' zoning violations, and only through the billing period ending in February 2018. Since that date, the Town's attorneys were called upon to present the enforcement complaint to the Court; conduct trial preparation, discovery, and motion practice; and participate in the two-day trial. We fully expect that the Town's fees and expenses for the enforcement action alone were much greater than the total presented.

(8) While the violation that continues (i.e., the un-permitted fill and gravel remaining on the Property) is somewhat minor in the realm of zoning violations, it continued through the end of our trial on January 30, 2019, and perhaps continues through this day.

The Pelkeys' violations have continued for a total of 610 days. Given the considerations detailed above, we conclude that the Pelkeys' actions and zoning violations warrant a fine of $25.00 per day, bringing the total fine owed to the Town of Westford by Mr. and Mrs. Pelkey to **$15,250.00.**

### Order

For all the reasons stated above, we **DENY** Theodore and Michelle Pelkey's zoning permit application for authority to construct an 8,000-square-foot accessory structure/garage on the front portion of their Property at 2189 Vermont Route 128 in Westford, Vermont. We further order Mr. and Mrs. Pelkey, who are jointly and severally liable, to pay to the Town of Westford the sum of **$15,250.00**.

Lastly, we hereby enjoin Mr. and Mrs. Pelkey from bringing further fill, gravel, or other earthen material onto their Property in excess of 50 cubic yards per year without first receiving a permit from the Town authorizing them to do so. We further direct that within **30 days** of this Decision, the Pelkeys shall remove the gravel, fill, and other earthen material from their building site, and lay topsoil on the building site and access drive, along with seed and mulch.

This completes the current proceedings before this Court. A Judgment Order accompanies this Merits Decision.

Electronically signed in Brattleboro, Vermont, on July 25, 2019, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division